The United States for the Court of Appeals in the Ninth Circuit is now in session. Good morning and welcome to the Ninth Circuit. Judge Tallman, Judge Graver and I are very excited to be sitting in San Jose and welcome to San Jose. This is our first sitting here at least in decades. So we have two cases that are submitted on the briefs. Martinez-Franco v. Garland, 18-72479 and Kapil v. Garland, 20-71817. Both of those are submitted on the briefs. We will hear the other cases in the order in which they appear on the calendar. The first is Baten v. Kijakazi, 22-15067. Each side will have 10 minutes and I just want to make sure that you can hear okay on the live stream. Can you hear me? Yes, Your Honor. Okay. Thank you. Great. I think we're ready to proceed then. May it please the Court, good morning, I am Andrea McEwen on behalf of the Homeless Action Center representing the appellant plaintiff, Ms. Anne Penny Baten. I would like to reserve two minutes for rebuttal, please. If this case does not sit right with you, that's because Ms. Penny did not get a fair shake. All of the treating, testifying and examining doctors' opinions support a finding of disability. But the question becomes, doesn't it, where we draw the line, when did the onset of disability begin? Isn't that what this case is all about? So even though she's been disabled for a very long time, the prior district court decision limited the scope of review to 2015 to 2017. So my question is, where do you draw the line between 2015 and 2017? My position is Ms. Penny has been disabled since 2008, possibly 2003. So absolutely disabled during the time period at issue. Notwithstanding the examination in, what was it, July of 2015, which was essentially, you So normal gait, that term has been mentioned more in the briefing than it has been in the thousands of pages of medical records at issue. Dr. Pond's opinion supports a finding of disability, specifically he limited the standing and walking ability to four to six hours, whereas a light residual functional capacity determination is at six hours. So could I just ask you about this point? Because I didn't see it in your opening brief. I didn't see it until your reply brief. And I'm wondering if that poses a four-picture problem. So I did repeat the district court ALJ repeated error that Dr. Pond's opinion did equal light. However, prior counsel in 2017 was arguing that Dr. Pond's opinion supported the sedentary RFC. And regardless if the objective evidence has not changed and it won't change and it's the medical records are in front of you and his opinion, the judge gave substantial weight to Dr. Pond's opinion because he found it was supported by the record. And specifically in his 2017 decision, he gave that sentence significant weight, four to six hour limitation. However, he never reconciled that with his RFC determination of six hours standing and walking. Now, he doesn't have to- Aren't you judicially a stop to change your position now? If your prior counsel didn't argue that the client was disabled in 2015 as a result of Dr. Pond- They did. We've been arguing for seven years that Ms. Penny is disabled. That is the crux of this case. I thought you just said that in 2015, he basically would have found RFC of light sedentary. Which is below a finding of light, which is categorically disabled. Okay. So she wouldn't have been able to work? No. Okay. We're all in agreement, the ALJ, the commissioner, and myself, that during this entire time period, she was of advanced age and she had severe impairments. And under, we can argue under the medical vocational guidelines, she should have been found categorically disabled. I understand your waiver arguments. And over the course of these years, our arguments have evolved. I think that if you're looking for a path to justice, the commissioner will try to narrow that path, but you still have a straight path to get there. How much money are we talking about? I have no real feel for what disability payments are on a monthly basis. They're about $1,000 a month, which is not enough to live off in the Bay Area. Right. So even though Ms. Penny now has benefits, this back pay is critical to her welfare. So we're arguing over about $20,000, is that right? Roughly. So at this point, Ms. Penny has always had insecure housing. She's on dialysis three times a week for the past five years. She's had her kidney removed. She's had eye surgery. She's now blind in both eyes. She has had a spent placement. She was found disabled as of May 2017, right? Yeah. So she's getting disability. Oh, and the other question I had for you is, what happens when she hits 65? Does she continue to receive disability payments in addition to Social Security? You don't get it in addition. SSI is the last stop. It's for people who have nothing else. She's never going to get more than $1,000 a month. But does it continue after she's eligible for Social Security and Medicare, is my question? She's only going to get $1,000 a month for the rest of her life. She's never going to get...  So it doesn't stop when... You can't get retirement and SSI at the same time. Okay. You get one or the other. It doesn't stop when she goes on Medicare and starts receiving Social Security payments. There are different paths to Social Security, disability, or retirement by age. In the end, it's one pool of money. You get one check. She's never going to get more than that. I suppose the question would be, if her retirement benefits would be greater than disability benefits, I suppose she could trade up. If she had more money... If you're entitled to retirement benefits, SSI makes you take that first. It makes you take early payments, which reduce the amount you're eligible for. She is 65. She's 65 now. I assume she worked enough quarters to be entitled to Social Security payments at 65 or 67, whatever that age is. The... We're not talking about retirement benefits here, but I can tell you that they will not be any higher amount than what she's getting now. Just trying to understand how the system works. And I should know this after hearing 23 years worth of Social Security cases, but I don't. Well, SSDI is based on your work history. SSI is for poverty relief for people who don't have eligible work history. Okay, but assuming she does, wouldn't she get the higher Social Security payment? The highest payment she can get is $1049 a month. And then they deduct... $1049 a month after they deduct the $1,000 disability or before? $1,049 total a month is all that she's eligible for. She cannot receive any more money than that. This back pay is critical to her welfare, but also she's entitled to it because all of the evidence from doctors who actually met and examined and treated her or testified at her hearing, they all found her to be disabled. Another question. So you argue in your brief that the ALJ didn't properly consider the ball sorter work experience because ALJ thought she could do the ball sorter job and you say she really never could do the ball sorter job. If that, let's assume that's an error, but you'll probably disagree with this, but let's also assume that the security guard finding was not an error. If the security guard finding is not an error, does that make the ball sorter issue harmless? Nothing is harmless if it changes the outcome of the case. But if she could do the security job, is that enough to say she's not disabled? Or is there something about the ball sorter analysis that undermines the issue in some other way? I mean, I think the ball sorter job is out there because it's supposed to be a less physical job, but she never attained average performance in that job. And past relevant work is an exception to the guidelines that she should have been found disabled under the guidelines. I thought the ALJ found that it did count as past relevant work because it didn't take very long to learn how to be a ball sorter. Well, it has to be substantially gainful income and she only did it for a matter of weeks and she was fired because she couldn't do the job. But I thought the regulation said it counts as past relevant work if whatever the time period is, you've worked long enough to learn how to do that job. Do I misunderstand the regulation? It does say that. If you can attain average performance, then you can do the job. But she never attained average performance. She was fired because she couldn't do the job. But we've got a factual finding that she did. So are you arguing that's not supported by substantial evidence? I think that the ball sorter job is kind of small potatoes. I think you don't even get to past relevant work if you find that the judge didn't have substantial evidence to support his assessment of the medical evidence, the residual functional capacity, and particularly for evaluating her symptoms, which I think is a highly relevant discussion. The I'm sorry, you're over your time. I'll still give you two minutes for a rebuttal, but I think we should hear from the other side. Okay, thank you. Thank you. Good morning, Your Honor. There's Daniel Talbert on behalf of the Acting Commissioner of Social Security, Kilolo Kijikazi. So as we've already discussed this morning, the claimant in this case, Ms. Baden, is disabled now. She's been disabled for several years, and she's been receiving benefits from the Social Security Administration going back about five years. The only question is, was it a reasonable interpretation of the evidence before the ALJ, for the ALJ to determine that she became disabled in May 2017? Counsel, I had some concerns about that. It seemed to me that the ALJ was rather arbitrary in picking that date, because the visit to the physician that occurred on that date relied in part on things that predated it. I'm not expressing that terribly well, but in other words, the May 27th information was quite consistent with earlier information. And I'm also concerned about the ALJ's reliance on the non-examining physicians in contrast to the examining physicians, because we're under the old regime here because of the date on which the claim was filed. So if you could address those matters, I'd appreciate it. Yes, Your Honor, absolutely. So I'll start with the first point about whether the May 2017 date was arbitrary. And our position is that it's really not arbitrary. Now, on the one hand, in Social Security disability cases, it's always the case that a claimant's going to be not disabled one day and then disabled the next. There has to be some onset date. And based on the regulations and the rulings, Social Security Ruling 18-1P is the relevant one in this case that applies here. You have the ALJ or the agency needs some kind of medical evidence, some sort of objective evidence, some clear basis in the record for finding an onset date, and they can't just kind of speculate backwards or make assumptions. They kind of need to ground it in something specific. And here, that May 2017 examination from Dr. Cohen and the resulting opinion was the first time on the record when there was evidence of any kind of additional limitations or symptoms or restrictions from work that would have put the claimant over the edge. I'm not sure if I worded that very well, but the issue here is that, you know, when we look at Dr. Pond, Dr. Chan, and Dr. Bradis, the three doctors who gave opinions in 2015 and 2016, their opinions aren't that different from Dr. Cohen's, but they're different enough that those first three would let the claimant do her past relevant work, and Dr. Cohen's opinion wouldn't. It isn't the difference. So it's just kind of right on the board. Is the difference four hours versus six hours? And if so, why isn't the four to six hour range that Dr. Pond said closer to four hours? Why do we assume that a four to six hour range means she can do six? Right. So with regard to that point, I have a couple of responses. The first one is, and I think the panel touched on this earlier, the claimant has plainly forfeited any argument that Dr. Pond's opinion supports disability. I mean, throughout the entire litigation of this case, the claimant was saying the ALJ was wrong to agree with Dr. Pond, should have agreed with Dr. Cohen or Dr. Shapiro. Dr. Pond is wrong. He doesn't know about the car accident. He doesn't know about the record. He's just wrong. And then all of a sudden, in the reply brief, oh, wait a minute, Dr. Pond would prove disability too. So that's obvious waiver. I don't think the court should even get to that. It would be a slippery slope to allow the claimant to change course. Except in Social Security cases, don't we have a somewhat less adversarial view? I mean, historically, I think some of our case law talks about this being not the typical adversarial proceeding where people are strictly held to this or that theory about how to read a medical record. I would respectfully disagree with that, Your Honor. I think that's true in regard to what we would call like administrative waiver or forfeiture. You know, do you have to present something to the appeals counsel? But as far as presenting it in the district court and then in the opening brief before this court, your case law is quite plain, I would say, on that. Gregor versus Barnhart. I would also point to Gray versus Commissioner of Social Security, which we cite in our brief where this court said that an argument was not made in Gray's opening brief. Thus, we deem it waived. And I would say this court has pretty consistently said in Social Security cases, just like everything else, the ordinary principles of litigation will apply because it is an adversarial process once the claimant appeals to the district court and then to this court. Do you have a substantive response to this 4-6 issue other than the waiver response? I do, Your Honor. And of course, I don't want to waive the waiver. I think that's plain enough that the court just really shouldn't even get there. That would be, you know, if I— We understand your argument. I'm wondering whether you also have a substantive—   Sure.  Sure. Sure.   Sure. Sure.                  of, you know, transparency. I think I'm happy to give that. So there's not a problem with Dr. Pond for two reasons. The first one is residual functional capacity means the most that you can do despite your limitations. So if Dr. Pond is saying, well, she's able to do four to six hours, that's not, I would submit, really different from what we often see where they say up to six hours. Six hours is the maximum. That's residual functional capacity. It's a reasonable interpretation to say that if a doctor says four to six hours, well, that would allow up to six hours. The other part of the response, I think, that's kind of maybe the legal, I guess, maybe a legal explanation. The factual one is that when you look at the two state agency assessments, and these are from doctors who are experts in social security disability programs. It's Dr. Chan and Dr. Bratis. The first one, I think Dr. Chan says that, well, Dr. Pond's standing and walking limitation seems overly restrictive. So it seems like Dr. Chan might agree with a claimant that's saying, oh, four to six, maybe that's less than six. But then Dr. Bratis, who reviews on reconsideration, looks at Dr. Pond and says, I agree with Dr. Pond. This claimant can stand and walk six hours. So we have two experts. So what is your response to my other part of my question, which has to do with believing the non-examining physicians over the examining physicians? Yes, Your Honor. My position is that that didn't happen here, respectfully. The ALJ agreed with examining source Dr. Pond, with non-examining sources Dr. Chan and Dr. Bratis, and then with examining source Dr. Cohen. But it's just for discrete periods. Dr. Pond examines the claimant in July 2015, and the ALJ agrees with what he says. Then Dr. Chan reviews records in 2015. ALJ agrees with Dr. Chan. Dr. Bratis, non-examining, reviews records in 2016. ALJ agrees with Dr. Bratis. And then Dr. Cohen examines the claimant in May 2017, finds some slightly increased symptoms and limitations. And the ALJ agrees with her. So really, this is a case where the ALJ agrees with all of those different doctors. He's just considering the time periods that they were looking at and what they were aware of. So this isn't the ALJ rejecting treating sources and examining sources and going with just someone that didn't examine the claimant. It's the ALJ actually considering what everybody said and making findings that are based on the record as a whole as he's supposed to do. Another point that I wanted to make in the brief time that I have left was just to state that the ALJ did find a disability onset in May 2017, which we've already talked about at some length. There's records certainly later in 2017 that show some significant additional problems and everything. And I know the claimant has addressed those and focused on those. But as the panel noted, the claimant was certainly disabled in that later period. And really, the ALJ on this record probably could have found a later onset date. He probably could have found the claimant disabled in October 2017 when the diabetes really took a turn for the worse. And there were all these serious limitations. I just want to make that statement just to indicate that the ALJ's finding of the May 2017 date, it's not arbitrary. It's not seriously harmful. It's not looking at things in the worst light for the claimant. It's actually somewhat more beneficial than other interpretations. Counsel, can you explain to me one of the things I'm a little bit troubled by because I don't know how to factor it into the evaluation is her refusal to treat her diabetes. Because it looked to me like a lot of the symptoms that she was complaining about, vision problems, foot problems, and that sort of thing, were related to untreated diabetes. I think you're right, Your Honor. I think that's absolutely right. And the issue with that is if a claimant is required to follow prescribed treatment, I disability law, it's in the case law, it's in the regulations, and everything. And if you're not complying with treatment, then that could actually be a basis for denying a claimant's disability claim outright. Now, that didn't happen here. And what I will point out is that during the period of non-disability, which ended in May 2017, the claimant's failure to comply with her diabetic treatment did result in a couple of these acute exacerbations where she had dizziness, she had various other symptoms and problems. But she got treatment for those. And once she actually got some treatment, those symptoms resolved pretty well. Now, it wasn't until after the established onset date in 2017, it wasn't until that October 2017, December 2017 period, where the diabetes, to put it frankly, kind of caught up to her. It may have been the years of the condition, it may have been the years of some issues with poor compliance and everything, but she eventually had some serious problems from it. And we agree that she was disabled because of that. Whether it was from her own poor judgment with not following treatment or not, she was disabled in that later period. So we're not falsing her for that. The agency did pay her benefits for that period. But for that earlier period, she had worse symptoms and everything when she wasn't compliant, when she wasn't doing these things, as Judge Palmer noted. But once she actually got to the hospital, got some treatment, they resolved and she was doing well. I see I'm well over my time. So unless there are any further questions, I'll ask the panel to affirm the ALJ's decision as supported by substantial evidence and free of reversible legal error. Thank you, counsel. We have some time for rebuttal. Thank you. The failure to follow prescribed treatment is actually an analysis of whether this treatment would allow someone to maintain capacity to earn substantially gainful activity, or if the person has good cause for not following the treatment. There is no analysis here. There's only insinuation. And that is throughout the decision, the commissioner's attempting to shore up the analysis because it's not there. We're forced to speculate over the judge's reasoning because it's not written in the four corners of his decision. The ALJ didn't find that her claim was denied because she didn't adequately address her diabetes problem. But wouldn't you agree, counsel, that a lot of the problems that she was suffering, the dizziness and the other issues, were related to untreated diabetes? So she testified in 2017 that it wasn't until that point that her doctors had put together her symptoms with, that they were related to her kidney disease. I thought the emergency room records in July of 2015 showed that she presented at the ER after the motor vehicle accident with symptoms that are directly related to untreated diabetes. And she was essentially released and told, go see a doctor to take care of that. But she didn't do that. So she routinely was seeking care throughout this time period. She was taking Metformin when she was in Trinidad, when the commissioner claimed she was noncompliant and gaps in treatment, it's not supported. But this is like a small piece of her big picture of her disabling impairments. But did, I mean, it later in October of 2017 resulted in the loss of a kidney, didn't it? Right. And we are speculating if she had taken Metformin five more times than she did, would she have not lost her kidney? It's kind of an exceptional argument to blame Ms. Penny for the extent of her disabling impairments over this many years. I beg to differ. It seems to me that this is really kind of like a person who is either an alcoholic or a drug addict who is also claiming disability from, in essence, voluntary acts. There's a Treviso v. Berryhill in 2017. No, I did not cite it. I found it before this oral argument. It's about noncompliance with diabetes medication. And how that is not enough to, that it would need to be weighed against her testimony of her symptoms rather than taken as a matter of fact that it would have miraculously healed her. She- CLJ didn't say that, but he did know, and there are several notations in the record where the treating doctors say you need to address your diabetes and- So we are talking about a woman who has undergone painful and exceptional procedures over the past several years where, you know, to be painting her as willfully obstinate in her own care- I'm not saying that. I'm not saying she's willfully obstinate, but the record does reflect that she was told on several occasions you've got diabetes- So that needed to be analyzed. To treat it. Yeah, and we're speculating because the judge didn't follow the failure to follow prescribed treatment analysis that he was required to follow if he was asserting that. May I continue or am I- Over your time, but you should finish answering Judge Solomon's question. I think so. Okay, I think we're done then. Thank you. Okay, thank you so much. Thank you both for the helpful arguments. This case is submitted.
judges: GRABER, TALLMAN, FRIEDLAND